IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

PACIFIC NATIONAL DEVELOPERS, INC, )
and SERGE SERDSEV, )
                                     )
             Plaintiffs, )    TC-MD 120598D
                                       )
          v. )
                                       )
DEPARTMENT OF REVENUE, )
State of Oregon, )
                                       )
          Defendant. )    **DECISION**

Plaintiffs appeal Defendant's 2006 audit adjustments. A trial was held on Tuesday, March 5, 2013. Dale R. Kennedy, Attorney at Law, appeared on behalf of Plaintiffs. Serge Serdsev (Serdsev), Dave Wilcox (Wilcox), Esther Thornburg (Thornburg) and Dan Porth (Porth) testified on behalf of Plaintiffs. Douglas M. Adair, Senior Assistant Attorney General, Department of Justice Tax & Finance Section, appeared on behalf of Defendant.

At the time set for trial, Plaintiffs informed the court and Defendant that the only audit adjustment being appealed was the disallowance of a deduction labeled Russian lumber project in the amount of $59,528. Plaintiffs stated that they accept the other audit adjustments proposed by Defendant.

Plaintiffs' Exhibits 32, 36, 53-54, 58-64, and 67-70 were admitted without objection.

## I. STATEMENT OF FACTS

Serdsev, owner of Pacific National Developers, Inc. (PNDI), (a subchapter S corporation), testified that the Russian lumber project was an opportunity that arose in October or November 2005 to import wood products from Russia that he could use in multiple housing projects he was developing and building. Serdsev was asked numerous questions about Pacific

National Developers, Inc.'s business. In response, he testified that "PNDI buys land, builds structures, and sells structures, buys and sells homes, develops subdivisions and builds apartments." Serdsev testified that a document titled Working Agreement between Mitkof Trade Group, LLC (Mitkof) and Resource Trade Group, Inc. (RTG) dated October 25, 2005, recited that those two entities were working together to bring Russian lumber products to the United States. (Ptfs' Ex 64.) Serdsev testified that he was a shareholder in RTG and the "intent was to make money." (Ptfs' Ex 59 at 3.) He testified that a document titled Resource Trade Group, Inc. Working Agreement recited that the RTG shareholders would work together in pursuit of "the procurement of Russian lumber products in support of" the "working agreement with Mitkof Trade Group, LLC." (Ptfs' Ex 58 at 1.) Serdsev testified that using checks drawn on his business, Pacific National Developers, Inc, checking account he loaned money on behalf of RTG to Mitkof. (Ptfs' Ex 59 at 3, 67.) The parties do not dispute that Serdsev wrote checks and checks were cashed. (Ptfs' Exs 67, 69, 70.)[1] Serdsev testified that he "asked for notes to evidence money transfers" but none were given even though he transferred a substantial sum of money during "the two year period." Serdsev acknowledged that he writes and has written checks on the PNDI account in payment of both business and personal expenses.

Wilcox, a managing member of Mitkof Trading Group, testified that the money Serdsev paid to Mitkof "was booked by the bookkeeper as loans" and a "K-1 was not issued to Serdsev." He testified that "there was no hope of repayment, the deal closed and the company closed." Wilcox testified that there was "no product, only samples" and Mitkof never sold any product; there were only ordinary and necessary expenses." In response to Defendant's questions, Wilcox

---

[1] Plaintiffs submitted copies of three checks made payable to Mitkof Trade Group, (one check in the amount of $20,000 with a loan memo notation, another check in the amount of $5,000 with a loan memo notation and another check in the amount of $700 with no memo notation) and one check to Dave Wilcox, an individual identified as the United States sales representative, in the amount of $10,000, showing a loan memo notation. (Ptfs' Ex 69 at 1-2, 4-5.)

testified that there were "no loan documents," no repayment terms for the loan, "no loan agreement between Mitkof and RTG, only a working agreement."

Serdsev testified that the first attempt to import Russian lumber in late 2005 and early 2006 was not successful. He testified that after RTG/Mitkof wired $50,000 to a Russian mill operator that individual sold the product promised to RTG/Mitkof to another buyer. Serdsev testified that Mitkof and RTG hired a Russian attorney to seek repayment of the $50,000 payment but there was no recovery of that payment. He testified that the original plan was for him to receive "an immediate pay back for the $50,000 from the first container," but he received "nothing." Serdsev and Thornburg testified that there was not a "signed contract" for this transaction prior to the wire transfer.

Serdsev testified that even though the first purchase was not successful, "they decided to hang in there and find another mill." He testified that a Russian corporation, SIBFOR, was formed with the assistance of Russian legal counsel. Serdsev testified that RTG/Mitkof "hired a local sales guy and translator" to accompany their United States sales representative "deeper into Siberia" to get "the best timber in the world." He testified that he placed numerous international calls and was involved "in the day to day decision making." Serdsev testified that "timber prices dropped," the United States independent contractor who was the sales representative "was not a closer" and RTG/Mitkof had "to pull back."

Thornburg, owner of Financial Business Services, Inc, testified that Thornburg Enterprises entered into a contract with RTG "to help with the paperwork" but there "were no books for RTG" and "there was nothing to create even though there was intent to make money." (Ptfs' Ex 60.) Thornburg testified that she thought that "there was a demand for repayment" of the payments made by Serdsev, referencing a telephone conversation she overheard. Wilcox

testified that there was "no written, formal demand" for repayment from his father who brought the parties together to create the Russian lumber project but there were attempts to collect the money wired for the first unsuccessful timber purchase.

Thornburg testified that she prepared the "books" for PNDI. She testified that she recorded the payments made for the "Russian lumber project" in the financial statement under the cost of goods section. Thornburg testified that in tax year 2006, $59,527.60 was reported as an expense and there was no reported sales income. (Ptfs' Ex 32 at 3.) Porth, a certified public accountant, testified that it was not "according to generally accepted accounting practice (GAAP)" to record all payments made to the Russian lumber project as expenses. He testified that the payments should have been recorded as a loan based on his review of supporting documents including review of Mitkof "books" and the "intent" of the parties. Porth testified that the "intent" was to "bring product into the states to use in PNDI home building at a favorable price that would result in a profit to PNDI." He testified that the "absence of loan documents alone does not mean it was not a loan."

## II. ANALYSIS

"The Oregon Legislature intended to make Oregon personal income tax law identical to the Internal Revenue Code (IRC) for purposes of determining Oregon taxable income, subject to adjustments and modifications specified in Oregon Law." *Ellison v. Dept. of Rev.*, TC-MD No 041142D, WL 2414746 at *6 (Sept 23, 2005) (citing ORS 316.007). As a result, the legislature adopted, by reference, the federal deductions, including those allowed under the Internal Revenue Code (IRC). ORS 316.007(2).[2]

/ / /

---

[2] All references to the Oregon Revised Statutes are to 2005. All references to the IRC and accompanying regulations are to the 1986 code, and include updates applicable to 2006.

"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. Plaintiffs must establish their claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Rev.*, 4 OTR 302 (1971)).

A. *Loan or Investment*

The threshold issue is a question of fact to determine the proper characterization of the Russian lumber project financial transaction as either an investment or a loan. *Cf Gibbons v. Dept. of Rev.*, 9 OTR 285, 286 (1982) (question of fact whether payment by corporation to its sole shareholder is either loan or dividend). Plaintiffs allege that the payments were a loan and because the loan was an uncollectible business bad debt Plaintiffs are entitled to a deduction. Defendant alleges that the payments were an investment or in the alternative incurred in the investigation of a new business, specifically start-up expenses.

The nature of the transaction is determined by the parties' intentions, as evidenced by facts and by attending circumstances. *See id*. at 286-87. Relevant circumstances include the presence or absence of an executed note or other evidence of indebtedness, interest was charged or stated, fixed maturity date and/or fixed schedule for repayment, required collateral, repayments were made, solvency of the borrower at the time the funds were advanced and the treatment of the transaction in the company's books. *See Gibbons at 286-287*; *Goldstein v. Comm'r*, 40 TCM (CCH) 752, WL 4118 (1980) (setting forth nine common factors characterizing a transaction as a loan.) If the facts and circumstances make it highly unlikely or impossible to determine whether and when the advanced funds will be repaid because payment is

contingent on future profits, the obligation may not be a debt. *See Fuscaldo v. U.S.*, 2001-2 US Tax Cas (CCH) ¶50780 (EDPA 2001), WL 1519684 (holding that advances to be repaid upon future generation of profits not a debt because bona fide debt obligation does not arise where there is no unconditional right to repayment.)

In this case, a note was not executed. There was no evidence of a written loan agreement. There was no testimony reciting a stated interest rate or interest paid. There was no evidence of any collateral for the funds. There was no evidence of a fixed repayment schedule. There was no repayment at any time. Plaintiffs recorded the distribution of funds as a current operating expense. At the time Serdsev advanced the funds Mitkof and RTG had no assets other than the funds being advanced by Serdsev; there is no evidence Mitkof and RTG were solvent at the time the funds were advanced.

Evidence supporting Plaintiffs' characterization that the transaction was a loan was Serdsev's testimony. Serdsev testified that he expected to be repaid from the proceeds from the sale of the Russian lumber. Unfortunately, the Russian lumber project was unsuccessful. The repayment of the payments was tied to the success of the project and not the assets of Mitkof and RTG. Porth testified that he reviewed the Mitkof books and that the payments were recorded as a loan. Even though copies of Mitkof's 2006 monthly bank statements from Sterling Savings Bank were submitted as evidence, Mitkof's books were not submitted as evidence. (Ptfs' Ex 53.) Plaintiff submitted evidence of three cancelled checks with a loan memorandum notation. (Ptfs' Ex 69 at 1-2, 4-5.) There were 16 reported fund transfers in 2006. (Ptfs' Ex 68.) The evidence is insufficient to conclude that the funds advanced were loans.

Even though there was a written document describing the working agreement between Mitkof and RTG, and a written document describing the working agreement of RTG and

Thornburg stating that Thornburg Enterprises entered into a contract with RTG "to help with the paperwork," there were no written documents describing the 16 reported fund transfers from Serdsev to Mitkof as a loan. Given the history of memorializing working relationships and contracting for the services of Thornburg Enterprises to "help with the paperwork," the lack of a written loan agreement and notes is puzzling. There is insufficient evidence to support a conclusion by the court that the payments were a loan.

Serdsev testified that he expected to recover the advanced funds from the sale of the Russian lumber. There was no evidence RTG/Mitkof had any other source of income to repay Serdsev. Serdsev's repayment was directly tied to the outcome of his investment. The court concludes that Plaintiffs' payments were an investment.

Having concluded that the payments were an investment, not a loan, Plaintiffs are not entitled to claim a bad debt deduction. IRC § 166 ("There shall be allowed as a deduction any debt which becomes worthless within the taxable year").

B. Deduction – IRC section 165

IRC section 165(a) allows a current deduction from income for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." IRC section 165 applies to individuals and corporations but there is a limitation on the deductible amount an individual may claim.

In this case, there are two Plaintiffs, PNDI and Serdsev. PNDI is a subchapter S Corporation. Serdsev is the sole shareholder of PNDI. Serdsev testified that the payment checks to Mitkof and RTG were signed by him. He testified that the checks were written on the PNDI bank account and PNDI was advancing the funds to Mitkof and RTG. The checks were written on check stock bearing the name "Emergency Relief Contracting," the prior corporate name of

PNDI and signed by Serdsev. (Ptfs' Ex 69.) Given Serdsev's testimony that PNDI checks were issued in payment of PNDI corporate expenses and Serdsev's personal expenses and all checks were signed by him, the evidence is not dispositive that PNDI advanced the funds to Mitkof and RTG. There was not a written agreement between PNDI and Mitkof and RTG. There was a working agreement between Mitkof and RTG. According to the testimony, RTG was to provide funds to promptly pay all invoices related to the Russian Lumber project. Serdsev is a principal in RTG; PNDI is not a principal in RTG. Given the evidence, the court concludes that Serdsev, an individual, advanced the funds to Mitkof and RTG.

For individual taxpayers, a loss under IRC section 165 is limited to (1) losses incurred in a trade or business or (2) losses incurred in any transaction entered into for profit, e.g., investment property. IRC § 165(c). An allowable IRC section 165(a) loss deduction "must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year." Treas Reg § 1.165-1(b) (as amended in 1977). The Ninth Circuit Court of Appeals, in *Honodel v. Comm'r,* 722 F2d 1462, 1468 (1984), concluded that a necessary requirement is that an individual taxpayer "seeking the deduction have entered into a *transaction*. Section 165(c)(2) deductions are normally not granted for expenses incurred in merely investigating possible transactions which are then not further pursued." (Emphasis in original) (citations omitted). *See also* Rev Rul 77-254, 1977-02 CB 63 (stating that investigatory expense are not allowed under IRC section 165 because the individual has not yet entered into a transaction for profit, nor engaged in an active business).

For the 2006 tax year, Defendant adjusted Plaintiffs' Oregon state income tax return, disallowing Plaintiffs' claimed deduction in the amount of $59,528. Evidence in support of the amount claimed as a deduction was a listing of expenses incurred by Wade Neal, totaling

$58,055.90. (Ptfs' Ex 70.) Those expenses were described as: telephone; taxi; travel; contract labor (paid "directly to Russians"); rent; motel; immigration stamps; food trip; laundry; business meet at restaurants; internet charges and copies; and cell card and phone. (*Id*.) There was no other evidence describing the expenses.

The expenses listed above are generally referred to as investigatory expenses. Costs of investigating an active trade or business are defined as the "costs of seeking and reviewing prospective businesses prior to reaching a decision to acquire or enter any business." H Rep No 1278, 96th Cong, 2d Sess (1980), 9; S Rep No 1036, 96th Cong, 2d Sess (1980), 10. IRC section 195(c)(1)(A) defines start-up expenditures as any amount "paid or incurred in connection with * * * investigating the creation or acquisition of an active trade or business, or * * * creating an active trade or business."

In this case, there was evidence that Plaintiffs were seeking profitable transactions but there is no record of any purchase and subsequent sale of Russian lumber, only investigation of possible transactions. Testimony supports this conclusion. Serdsev testified that "timber prices dropped," the United States independent contractor "was not a closer" and Mitkof and RTG had "to pull back."

The characterization of those expenses as start-up expenditures is applicable in reviewing the books and records of Mitkof and RTG, not Plaintiffs' books and records. Serdsev provided the funds to Mitkof and RTG. Those payments resulted in an investment by Plaintiffs in Mitkof and RTG, not IRC section 195 start-up expenses deductible by Plaintiffs.

IRC sec 165 allows an individual a deduction limited to "losses incurred in any transaction entered into for profit, though not connected with a trade or business." Serdsev testified that he made the payments to Mitkof and RTG with the expectation that the sale of

Russian lumber would result in a profit and that according to the Mitkof and RTG working agreement a percentage of that profit would pass through to him. Plaintiffs' losses were not connected with a trade or business because Mitkof and RTG never realized its business plan to import Russian lumber and Plaintiffs never purchased Russian lumber from Mitkof and RTG for resale or its own use in its current home construction business. That outcome was not known until 2008 when Plaintiffs and Mitkof and RTG abandoned the Russian lumber project. Serdsev, an individual, may be entitled to claim an IRC section 165 loss in tax year 2008, but not the tax year (2006) before the court.

## III. CONCLUSION

After careful review of the testimony and evidence, the court concludes that Plaintiffs did not make a loan to RTG/Mitkof. The testimony and evidence support the conclusion that Serdsev may be entitled to claim an IRC section 165 loss in the year the project was abandoned. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs are not entitled to claim a deduction for expenditures labeled the Russian lumber project in the amount of $59,528 in tax year 2006.

IT IS FURTHER DECIDED that Plaintiff, Serge Serdsev, may be entitled to claim an IRC section 165 loss for the investment made in Mitkof and RTG because Mitkof and RTG terminated its primary activity, the Russian lumber project, and abandoned further joint projects in 2008.

/ / /

/ / /

/ / /

IT IS FURTHER DECIDED that Plaintiffs accept the audit adjustments proposed by Defendant for the 2006 tax year other than the disallowance of expenses identified as the Russian lumber project.

Dated this ____ day of June 2013.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on June 3, 2013. The Court filed and entered this document on June 3, 2013.*